UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MERRY JOHNSON                           CIVIL ACTION

VERSUS                                  NUMBER: 12-0095

MICHAEL J. ASTRUE,                      SECTION: "H"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits. (Rec. docs. 15, 16, 17).

Merry Johnson, plaintiff herein, filed the subject application for SSI benefits on March 26, 2009, alleging disability as of October 1, 2008. (Tr. pp. 101-105).  In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as manic depression, bipolar disorder, arthritis, fibromyalgia, obesity, and high blood

pressure.   (Tr. pp. 127-135).   Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on June 10, 2009.  (Tr. pp. 57-60). Pursuant to her request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 27, 2010 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 61-63, 28-54).  On July 9, 2010, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.   (Tr. pp. 11-27).   The Appeals Counsel ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-6).  It is from the unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the sole issue for judicial review as follows:

1.   [t]he decision rejects the opinions of the treating and examining physicians and substitutes the medical opinions of the ALJ.

(Rec. doc. 15-2, p. 1).

Relevant to the issue to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant has not engaged in substantial gainful activity since March 26, 2009, the application date (20 CFR 416.971 et seq.).

2.   [t]he claimant has the following severe impairments: obesity; fibromyalgia; sleep apnea; lumbar spondylosis. (20 CFR 416.920(c); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p).

3.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 416.967(a).

5.   [t]he claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   [t]he claimant was born on May 11, 1971, and was 37-years-old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.   [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   [t]ransferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   [t]he claimant has not been under a disability, as defined in the Social Security Act, since March 17, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 16, 18, 19, 22, 23).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).  The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner.  Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985).

4

Conflicts in the evidence are for the Commissioner to resolve, not the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  an individual who does not have a "severe impairment" will not be found to be disabled.

3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

    5.    if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reached the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period[1]/ begins with a treatment note dated February 11, 2008

---

    [1]/ Under 20 C.F.R. §416.912(d), the Commissioner is generally obligated to develop the medical history of an SSI claimant for the twelve months prior to the month in which the application for benefits was filed. As plaintiff filed her application in March of 2009, the relevant time period thus begins in February of 2008.

from Dr. Gregory Morris who was monitoring plaintiff in connection with her most recent pregnancy.  Complaints at the time were severe abdominal pain but a physical examination was within normal limits. Plaintiff's occupation was identified as that of a teacher.  An ultrasound was ordered.  (Tr. pp. 232-235).  On February 15, 2008, plaintiff was seen by Dr. Michael Marcello, a general practitioner with the Family Doctor Clinic of Matthews, for complaints of right elbow pain radiating up the shoulder and weakness.  Right elbow tenderness was noted upon examination and the diagnosis was right elbow pain secondary to tendonitis.  Tylenol #2 was prescribed. (Tr. p. 204).  Obstetric follow-up was performed by Dr. Fred Cardwell on March 3, 2008 with the complaint at the time being a "bulge" between the legs after plaintiff had run earlier in the day.  Another ultrasound was ordered.  (Tr. pp. 228-231). Plaintiff return to Dr. Cardwell on March 17, 2008 with edema, a cough, and wheezing.  The assessment was coughing and congestion and plaintiff was prescribed Phenergen with codeine and Lasix. (Tr. pp. 224-227).

Plaintiff was seen again at the Ochsner Clinic on April 14, 2008 for monitoring of her pregnancy, this time by Dr. Charles Faucheaux.  There was 2+ protein on random urinalysis and +2 reflexes but plaintiff's swelling was not as bad as it was on the previous visit.  Further lab work was ordered.  (Tr. pp. 220-223).

7

Contractions, abdominal pain, and vaginal pressure were complained of on April 28, 2008. Plaintiff had been seen in the emergency room several days earlier for possible premature labor. The administration of progesterone was begun to prevent preterm labor. (Tr. pp. 218-219). By June 8, 2008, plaintiff had begun leaking clear fluid when she was seen again by Dr. Morris and she was transferred to Ochsner for admission. (Tr. pp. 264-268). The admission diagnosis included preterm premature rupture of the membrane, breech presentation, and massive obesity. Plaintiff went into labor on June 11, 2008 and a transverse cesarean section and bilateral tubal ligation were performed. She was ultimately discharged on June 15, 2008 with instructions to follow up with Dr. Morris. (Tr. pp. 260-263).

On July 9, 2008, plaintiff was seen at the Ochsner Clinic for evaluation and management of the incision to her lower abdomen which was not healing properly. Wound cultures of one week earlier were positive for staph aureus. Plaintiff stood at 5'5" tall and weighed 319 pounds. Upon physical examination, plaintiff had good muscle strength and tone throughout with a normal gait. Pain secondary to the unhealing wound was rated as moderate. The impression was a nonhealing low transverse abdominal incision wound. Specimens were taken, wound care was provided along with counseling, and plaintiff was to continue on a course of

8

antibiotics.  (Tr. pp. 257-259).  Plaintiff was seen again at Ochsner for re-evaluation of her wound on July 17, 2008.  (Tr. p. 255).  Unfortunately, despite the care that was administered, plaintiff developed a wound seroma and was admitted for treatment with antibiotics and ultimately underwent incision and drainage at the site of the earlier c-section.  Plaintiff was discharged several days later with instructions to follow up with Dr. Robichaux.  (Tr. pp. 245-254, 273).

Plaintiff returned to Dr. Marcello on August 28, 2008 with complaints of arthritic pain in the form of generalized joint stiffness since being off of medication as a result of her pregnancy.  The assessment was global arthralgia and plaintiff was prescribed Effexor XR.  (Tr. p. 203).  By September 18, 2008, the condition of plaintiff's surgical wound had again worsened and she underwent selective debridement coupled with another course of antibiotics.  (Tr. pp. 336-340).  A limited ultrasound was also performed which revealed no evidence of residual abscess.  (Tr. p. 272).  Plaintiff received further wound care at Ochsner on September 25, 2008.  The dosage of Effexor was to be increased.  (Tr. pp. 330-332).  Additional wound care was administered on October 7, 2008.  (Tr. pp. 333-335).  When plaintiff failed to return for more follow-up appointments she was discharged from Outpatient Rehab Services on November 11, 2008.  (Tr. p. 341).

9

On November 24, 2008, plaintiff was seen again by Dr. Marcello for generalized arthritic pain, a ganglion cyst to the left wrist, and symptoms of a urinary tract infection. Her weight on this date was recorded as 321 pounds. Medications were prescribed. (Tr. p. 202). On February 9, 2009, plaintiff reported that Effexor was no longer effective and that she was experiencing crying spells and feelings of being overwhelmed. Her medications were adjusted to Symbyax, Darvocet, and Ativan. (Tr. p. 200). On February 25, 2009, plaintiff presented to Dr. Marcello's office with complaints of pain to the arms and legs, swelling to the extremities for the previous six weeks, and shortness of breath on exertion. She was not taking Demadex at the time. The assessment was fluid retention, fibromyalgia, back pain, weight gain, and shortness of breath on exertion. Various testing was ordered and plaintiff was directed to resume Demadex as prescribed in addition to taking Vicodin ES and Symbyax. (Tr. p. 201). Of the tests that were conducted that date, and ECG was characterized as abnormal with a normal sinus rhythm but an anterior infarct could not be ruled out. (Tr. pp. 213-217).

On March 4, 2009, plaintiff was evaluated at the Cardiovascular Institute of the South pursuant to a referral from Dr. Marcello. Complaints at the time included chest pain and daily tightness for the previous month, greater with activity, and

dyspnea on exertion.  Upon physical examination, plaintiff had 1+ edema of the extremities and peripheral pulses of 1+.  Capabilities of the musculoskeletal system were characterized as slow.  The assessment included chest pain/shortness of breath/paroxysmal nocturnal dyspnea, obesity/probable obstructive sleep apnea/dyspnea on exertion, a history of anxiety, degenerative joint disease, and hypertension.  Toprol XL and Demadex were prescribed and further testing including a sleep study was to be scheduled.  (Tr. pp. 279-280, 282-283).  Transthoracic echocardiography that was performed on that date revealed normal left ventricle size, wall thickness, and systolic function; normal valvular morphology; and, no significant regurgitation.  (Tr. pp. 285-286).  However, an ECG that was done two days later was deemed to be abnormal with a normal sinus rhythm but an anterior infarct could not be ruled out. A stress test of that same date was non-diagnostic for ischemia with stress-induced chest tightness but no stress-induced arrhythmias and a normal blood pressure response to exercise.  (Tr. pp. 284, 281).

Plaintiff still had chest pain with activity and shortness of breath when she returned to the Cardiovascular Institute on March 13, 2009.  She was advised to lose weight, proceed with a sleep study, and increase the dosage of Demadex.  (Tr. p. 276). Plaintiff was next seen by Dr. Marcello on March 16, 2009 for

11

complaints of an ache in the legs.  She sleeping six hours per night.  A perfusion study had produced unremarkable results but plaintiff continued to gain weight which was now measured as 351 pounds on this date.  The assessment included fibromyalgia, hypertension, and generalized anxiety disorder.  Plaintiff was instructed to decrease her caloric intake, to increase walking, and to start on Relafen.  (Tr. pp. 199, 400, 211-212).  Chest x-rays that were performed on March 25, 2009 were normal.  (Tr. p. 210). Plaintiff complained of extreme right shoulder pain on March 31, 2009 without any apparent trauma.  Toradol was prescribed and x-rays were ordered.  (Tr. p. 198).

On April 2, 2009, plaintiff underwent a polysomnogram at Total Sleep.  Principal complaints included heavy snoring, high blood pressure, obesity, enlarged neck circumference, daytime drowsiness, and loss of energy/fatigue.  Following testing, the diagnosis was sleep disordered breathing manifested by 219 RERA's, 191 hypopneas, 13 OA's, and an AHI of 36.6 with mild to moderate snoring and oxygen saturation rates dropping to 78%; obesity; hypertension; and, fragmented sleep architecture and excessive daytime hyper-somnolance with delayed REM onset.  Recommendations included a CPAP titration study, weight loss, a discussion of sleep hygiene issues, and avoidance of driving when tired.  (Tr. pp. 345-351).  Plaintiff returned to the Cardiovascular Institute to discuss the results of

the sleep study on April 27, 2009.  She weighed 359 pounds at the time and had 2+ peripheral edema.  Plaintiff was referred to another doctor and was advised to obtain a CPAP machine, avoid long distance driving, and adhere to a strict diet.  The dosage of Demadex was increased.  (Tr. p. 366).

A further sleep study involving CPAP titration went forward on April 28, 2009.  As the pressure was increased so were respiratory events and plaintiff's tolerance of the treatment was good.  (Tr. pp. 352-359).  Plaintiff was provided a CPAP machine with a full face mask and a heated humidifier the following day.  (Tr. pp. 360-362).  On May 6, 2009, plaintiff was seen again by Dr. Marcello to further discuss the sleep study results and for depression.  The assessment was sleep apnea and panic attacks for which Xanax was prescribed.  (Tr. p. 380).

On May 26, 2009, plaintiff underwent a consultative psychological evaluation by Dr. William Fowler.  Plaintiff advised the doctor that she had been diagnosed with bipolar disorder and schizophrenia, suffered from physical problems, had never been able to keep a job because of her inability to handle stress, could not walk far, suffered from fibromyalgia and arthritis in the back and legs, and had to ride a cart to shop at the store.  She recalled a lengthy history of treatment for mental disorders as well as a suicide attempt and hallucinations.  The CPAP mask that she had

recently obtained made her feel claustrophobic and caused panic attacks.

Plaintiff was able to bathe, dress, and feed herself but needed assistance with laundry because she could not bend. She could sometimes cook, grocery shop in a cart, and drive short distances and her older children assisted with the care of her youngest child. Financial matters were handled with some difficulty and plaintiff had trouble remembering things like appointments. Thoughts were logical and coherent but a bit overinclusive in explanations at times. No obsessions or compulsions were reported and plaintiff denied paranoia but did not trust people. There were no delusions, suicidal or homicidal feelings, or hallucinations. Plaintiff related being usually depressed, constantly worried, experiencing panic attacks in which she felt that she could not breathe, sweating, and crying. Prescribed medication helped but left her so sleepy that she could not go anywhere afterwards. Crying spells occurred daily and plaintiff appeared anxious and depressed during the evaluation. Recall was good and plaintiff was able to carry out simple instructions with no difficulty. Judgment and insight were noted as fair. Plaintiff's ability to pay attention for two-hours blocks of time was intact but she had mild difficulty understanding detailed instructions. She appeared anxious and depressed,

14

functioned at a slow pace, and was impaired to an unspecified degree in her ability to handle the stress of a regular forty-hour week. Plaintiff primarily complained of physical limitations with difficulty in walking or standing for long periods of time and attendant pain. Dr. Fowler's diagnosis was as follows: Axis I - major depressive episode with psychotic features, recurrent, "moderate, mild" response to treatment, and anxiety, not otherwise specified, "moderate, mild" response to treatment; Axis II - borderline personality traits; and, Axis III - arthritis, fibromyalgia, obesity, hypertension, and sleep apnea. (Tr. pp. 296-299).

On March 31, 2009, plaintiff completed the Administration's "Function Report - Adult" form that elicited information about how her conditions limited her activities. There, plaintiff described an average day as involving rising in the morning, readying her older children for school, and tending to and feeding her youngest child until he was ready for a nap. Plaintiff then watched TV, used the computer, and tried to do some housework. However, she was unable to stand or sit for more than a couple of minutes at a time so she ended up lying down to relieve the pain in her back and legs. Afternoons were much the same until her children arrived home from school when she helped them with their homework. With assistance, plaintiff would then prepare dinner. Pain affected

15

plaintiff's sleep and she had cut her hair very short because it
was too difficult to brush.  Plaintiff had to be reminded to take
her medication and she needed help preparing full meals.  From a
sitting position plaintiff could wash dishes and fold clothes.  She
was able to drive but did not get out of the house much because her
size inhibited her mobility and because of numbness in the legs
after sitting for long periods of time.  Plaintiff was able to shop
for short periods of time but she did so using a motorized cart.
She rarely got out of the house for social activities.  Plaintiff's
lack of mobility and pain limited almost all of her abilities and
often she would not even leave the house to retrieve the mail.
(Tr. pp. 140-148).

On June 2, 2009, Dr. Jeanne George, an Administration medical
consultant ("MC") in the psychological field, reviewed plaintiff's
file and set forth her findings in two separate forms.  In one of
the forms, which was denominated "Psychiatric Review Technique",
the MC checked off the appropriate boxes to indicate that a
residual function capacity ("RFC") assessment was necessary and
that plaintiff suffered from a co-existing non-mental impairment(s)
that required referral to another medical specialty.  Additional
boxes on the form were checked off to indicate that plaintiff's
conditions had been evaluated against the criteria set forth in
Sections 12.04, 12.06, and 12.08 of the Listing of Impairments.

16

Identified as an impairment which did not precisely satisfy the criteria of Section 12.04 was major depressive episode, recurrent, and a history of psychotic features.  Under Section 12.06, plaintiff was said to be suffering from anxiety disorder, not otherwise specified.  In connection with Section 12.08, plaintiff was felt to be suffering from borderline personality traits.  In terms of functional limitations, plaintiff was believed to have a mild restriction in the activities of daily living and moderate restrictions in maintaining social functioning and in maintaining concentration, persistence, or pace but had experienced no episodes of decompensation of extended duration.  (Tr. pp. 305-318).

The second form that was completed by the MC on June 2, 2009 was titled "Mental Residual Functional Capacity Assessment." There, the MC checked off the appropriate boxes to indicate that plaintiff was moderately limited in her ability to understand and remember detailed instructions but was not significantly limited in the two other areas of understanding and memory; that she was moderately limited in four areas of sustained concentration and persistence but was not significantly limited in the four others; that she was moderately limited in two areas of social interaction but was not significantly limited in the three others; and, that she was moderately limited in two areas of adaptation but was not significantly limited in the two others.  In short, plaintiff was

17

thought to be capable of performing some form of work. (Tr. pp. 301-304).

Plaintiff returned to Dr. Marcello on June 10, 2009 for a check of her medications and her weight was measured as 355 pounds on this date. The assessment included panic attacks, fibromyalgia, and sleep apnea. Symbyax was to be discontinued and plaintiff was prescribed Xanax. (Tr. pp. 378-379). On that same date a second Administration MC, Dr. Joseph Michalik, reviewed plaintiff's file and set forth his opinions in a "Physical Residual Functional Capacity Assessment" form. Plaintiff's primary diagnosis was identified as obesity, her secondary diagnosis was identified as hypertension, and fibromyalgia was identified as yet another impairment. Dr. Michalik checked off the appropriate boxes on the form to indicate that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours in an eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds, could occasionally climb a ramp/stairs, and could frequently perform the other postural maneuvers; and, had no manipulative, visual, communicative, or environmental limitations. (Tr. pp. 319-326).

Plaintiff was seen again by Dr. Marcello on June 24, 2009 for complaints of nausea and a headache after eating a chicken

sandwich.  Medication was provided.  (Tr. p. 376).  On July 27, 2009, plaintiff met with Dr. Marcello to discuss her medications and for complaints of chest and sinus congestion.  Her weight was recorded as 357 pounds on this date.  The assessment included generalized anxiety disorder, hypertension, fibromyalgia, and sciatica on the left side.  Neurontin was prescribed.  (Tr. pp. 374-375).  Radiographic studies that were performed on that same date revealed mild degenerative endplate lipping at L3-4, L4-5, and L5-51 but reasonably well-maintained disc spaces.  The radiologist's impression was mild spondylosis.  (Tr. p. 382).  On August 25, 2009, plaintiff reported that the prescribed Neurontin was not helping.  She complained of persistent pain in the back, hip, and legs.  There was 1+ edema in the hands and legs.  The assessment was fibromyalgia and hypertension.  Flexeril and Gabapentin were prescribed.  (Tr. pp. 370-371).

On August 29, 2009, Dr. Marcello completed a "To Whom It May Concern" checklist form in which he reported various complaints as being consistent with his knowledge and understanding of plaintiff's condition.  There, Dr. Marcello checked off the appropriate blanks on the form to indicate that, on protracted sitting, plaintiff experienced pain in the low back and numbness in the lower legs but no radiation of the pain into the legs, no need to elevate the feet to heart level to reduce/preclude edema, and no

spontaneous somnolence.  On protracted standing/walking, plaintiff reportedly suffered from low back pain without radiation into the legs, burning neuropathy in the legs, and fatigue.  Dr. Marcello indicated that on most days plaintiff had to lie down much of the day for relief of low back pain.  She experienced no cervical pain or vertigo when looking down for more than a few minutes and she had no symptoms/signs associated with a disturbance of the labryinthine-vestibular function.  Dr. Marcello checked off additional boxes on the form to indicate that plaintiff was unable to do the following without exacerbating her condition or causing significant pain: stand or walk for six hours in an eight-hour day; stand/walk for two hours in an eight-hour day while lifting/carrying up to twenty pounds; stand/walk for two hours in an eight-hour day while lifting/carrying up to ten pounds; stand/walk for two hours in an eight-hour day; or, alternate standing and sitting for eight hours without walking about or reclining.  (Tr. pp. 372-373, 384-385).

On November 30, 2009, plaintiff was seen at the Leonard J. Chabert Medical Center ("LJCMC") for complaints of severe low back pain and shoulder pain.  The treatment note from that date also mentions a cyst in the right knee.  Plaintiff's weight was recorded as 333 pounds on this date.  Upon physical examination, plaintiff had no edema but she did have some tenderness over L3-4 and at the

20

right sciatic notch along with positive straight leg raising on the right. The diagnosis was low back pain and plaintiff was prescribed Meloxicam, Flexeril, and Tramadol. (Tr. pp. 389-391). Plaintiff was next seen at the Family Doctor Clinic on December 16, 2009 for follow-up of her fibromyalgia and anxiety. Numbness and muscle weakness were present and it was noted that plaintiff had never seen a neurologist. The assessment included fibromyalgia, sciatica, fluid retention, and chronic pain. Medications were prescribed including Neurontin, Lexapro, Demadex, Xanax, and Vicodin ES. Various lab work was performed and a neurological referral was sought. (Tr. pp. 404-409). By December 29, 2009, plaintiff was said to be doing better on Lexapro. The assessment on this date was anxiety and depression and plaintiff was maintained on Lexapro. (Tr. pp. 402-403). Plaintiff was apparently seen at the Ochsner Saint Anne General Hospital's Emergency/Outpatient Services on January 25, 2010 but the purpose of that visit is not reflected in the record. (Tr. p. 401).

On March 11, 2010, plaintiff presented to the LJCMC Women's Clinic for her annual exam. She complained of bladder leakage and had been taking Demadex which was helpful but she could no longer afford it. Plaintiff's weight was measured as 372 pounds on this date. Her abdomen was morbidly obese and she had a yeast infection under her mammary folds. The assessment included the yeast

21

infection, stress incontinence, and morbid obesity.  Medication was prescribed and plaintiff was encourage to exercise and to lose weight.  (Tr. pp. 387-388).

Plaintiff returned to the Family Doctor Clinic on March 29, 2010 for a check-up and for monitoring of her medications.  She had twisted her left ankle two weeks earlier which was still very painful.  X-rays revealed a fracture at the base of the fifth metatarsal.  Vicodin and Anaprox were prescribed and a cast was put on the affected foot.  (Tr. pp. 395-399).  The fracture was healing by March 31, 2010 but the cast was very loose around the ankle. (Tr. pp. 393-394).

As noted earlier, a hearing de novo before an ALJ went forward on April 27, 2010.  After the exhibits were formally admitted into evidence plaintiff's attorney offered an opening statement in which he argued that plaintiff was unable to do a full range of sedentary work due to obesity, back pain, urinary incontinence, mental problems, and edema in the feet.  Plaintiff then took the stand and was questioned by her attorney.  She was thirty-eight years of age at the time, had completed high school and had attended two semesters of college, and weighed 374 pounds.  Plaintiff had last worked for two years as a personal care assistant in 2007-2008 as well as another job before that which ended in August of 2006. Prior to that she had performed fast food jobs.  She lived in a

house with her husband, sixteen-year-old son, seven-year-old daughter, and twenty-two-month-old son.  She had no stairs in the house as they were problematic for her.  Plaintiff had a driver's license and drove two to three times per month to shop but her husband did the majority of the shopping.  She could wash dishes and cook simple meals from a sitting position and performed chores such as sweeping, mopping, and dusting with help from her husband, daughter, and sister.  Plaintiff could use a computer for ten minutes but was otherwise unable to sit for very long.  She did no yard work and reportedly left her house only three times per month, attending church occasionally.  Plaintiff went to no meetings with teachers at her children's school and had no hobbies.

An average day for plaintiff involved rising at 6:45 a.m., dressing her daughter from a sitting position, and then tending to her youngest child when he woke up.  She needed assistance from her husband in bathing and toileting and spent most of the day reclining or lying down due to back, leg, and hip pain.  She also watched TV.  Later, she would help her youngest daughter with her homework, again while lying down, and she received assistance in caring for her young children from her husband and her nineteen-year-old daughter.  In the previous year plaintiff had experienced a major weight gain and her doctors had cautioned her against salt

23

intake and to avoid fatty or fried foods. Doctors had also recommended that she walk but it was simply too painful.

When asked about her various physical conditions plaintiff testified that she experienced spasms in the low back and arthritic-like pain in the knees and legs that was sometimes so bad that she was unable to move. The pain was usually dull but sometimes intense, particularly on the right side, and she had sciatic nerve involvement from the hips down the legs and into the feet. Her right knee was worse than the left one. Plaintiff also experienced a good deal of pain in the feet and ankles, swelling, and cellulitis to the front area of the leg. Pain was triggered by walking or standing which plaintiff estimated that she could do comfortably for only ten minutes. Plaintiff reported that her feet were becoming discolored as the hearing was in progress. Plaintiff also advised the ALJ that she had broken her left foot on March 12, 2010, that she thus used a cane for ambulation, and that she currently wore a cast that had already been replaced twice. For her sleep apnea she used a CPAP machine which did help but the mask caused her to have panic attacks. Plaintiff also suffered from urinary incontinence which required numerous bathroom visits in the day and night.

In terms of her mental disorders, plaintiff testified that she had been diagnosed with manic depression and schizophrenia at the

age of twelve.  More recently her condition had been referred to as
bipolar disorder manifested by constant mood swings and feelings of
worthlessness that occurred four to five times per week for two to
three hours at a time accompanied by crying.  Anxiety caused her to
have panic attacks.  For these conditions plaintiff took Xanax and
Lexapro which had been prescribed by Dr. Marcello and his nurse
practitioner.  She had not been under a mental health specialist's
care for six years.  An additional physical malady afflicting
plaintiff was fibromyalgia since the age of eighteen that caused
muscle pain, spasms, and a burning sensation to the skin upon
touching.  Merely wearing clothes was reportedly painful to
plaintiff.  She estimated that she could walk fifty feet before
experiencing back and leg pain and shortness of breath.  After
standing for ten minutes, plaintiff would have back spasms and
radiating pain to the legs.  Sitting could only be done for thirty
minutes before plaintiff would have to alternate positions.  She
could lift her son who weighted twenty-four pounds but bending was
painful to the back and crawling could not be accomplished due to
her knees.  Plaintiff's chest also hurt when she raised her hands
over her head.

Upon being tendered to the ALJ for further questioning,
plaintiff testified that she had been fired from her most recent
job because of alleged Medicare fraud.  Plaintiff explained that at

the direction of her direct supervisor she had cared for the supervisor's disabled foster son in her own home which had not been inspected and cleared for that purpose.  Plaintiff had seen Dr. Marcello for her monthly visit approximately two weeks earlier and she was scheduled to see a neurologist in the upcoming days.  (Tr. pp. 48-50).

Cindy Harris, a VE, was next to take the stand.  She began by classifying the exertional and skill demands of plaintiff's past work as a personal care assistant as, respectively, medium and semi-skilled.  The ALJ then posed a hypothetical question to the VE which assumed a "younger" individual who was capable of sedentary-level work and who had a high school education.  In answer thereto, the VE testified that the individual described in the hypo would be unable to do plaintiff's past work but could perform the unskilled jobs of information clerk, general office clerk, and financial clerk with significant numbers of such jobs existing in the national and local economies.  Upon being tendered to counsel for further questioning, the VE testified that an individual could still maintain employment if he or she had to recline more than an hour for lunch and during normal break periods.  The VE was then directed to the results of the Mental Residual Functional Capacity Assessment that the Administration's MC had performed on June 2, 2009 wherein it was noted that plaintiff had moderate limitations

in nine of the twenty listed mental activities.  In answer to that question, the VE testified that the term "moderate" was not defined and that such a degree of limitation in, for example, the ability to understand and to carry out detailed instructions would not eliminate the jobs that she had identified as they all involved unskilled work.  Following this testimony, the ALJ agreed to leave the record open for fourteen days for the submission of any additional medical records.  (Tr. pp. 51-53).

Two days after the administrative hearing, plaintiff was seen by Dr. Jamie Huddleston, a neurologist affiliated with Ochsner. Various forms of lab work were done and EMG/NCS studies and an ultrasound were to be performed.  (Tr. pp. 431-436).  The final group of medical records documents plaintiff's visit to the Ochsner Emergency Room on May 12, 2010 for left foot and ankle pain. Plaintiff explained to the attending medical personnel that she had twisted her foot/ankle inside what was then her third walking cast some five days earlier which she had then removed herself with a hacksaw.  X-rays of the left lower extremity were unremarkable at the ankle but did reveal a fractured base of the fifth metacarpal. A resting ABI was normal for the left ankle but suggestive of minimal right lower extremity arterial disease.  The diagnosis was an ankle sprain and plaintiff was suited with an airsplint and was fitted for crutches.  (Tr. pp. 411-431).

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on one broad ground, that the ALJ improperly rejected the opinions of her treating and examining physicians and substituted his own opinions therefor without adequate support.  Finding that contention to have merit, for the reasons that follow it will be recommended that plaintiff's case be remanded to the Commissioner.

In his written decision, the ALJ found that plaintiff suffered from severe impairments in the form of obesity, fibromyalgia, sleep apnea, and lumbar spondylosis, nothing that said conditions "... produce more than [a] minimal impact on functioning." (Tr. p. 16). That finding was consistent with the definition of a "severe impairment" which is anything more than a slight abnormality having such a minimal effect on the individual that it would not be expected to interfere with his or her ability to work.  See Anthony, 954 F.2d at 293; Stone v. Hackler, 752 F.2d 1099, 1101 (5th Cir. 1985).  As respect plaintiff's mental impairments, however, the ALJ concluded that they were not severe.  (Tr. pp. 17-18).  In reaching that conclusion, the ALJ first observed that plaintiff had not received any treatment from a specialist in the field of mental healthcare for a number of years.  (Tr. p. 17).  After briefly citing the treatment plaintiff had received from Dr. Marcello, the ALJ then turned to the results of the consultative psychological

28

evaluation that had been performed by Dr. Fowler.  In the Court's experience, consultative evaluators who are selected by the Commissioner generally provide opinions that are at the conservative end of the spectrum.  Among the opinions that Dr. Fowler had expressed in his report were that plaintiff's ability to handle the stress of a forty-hour work week was impaired due to mood.  While crediting other of Dr. Fowler's findings, the ALJ declined to accord significant weight to the opinion regarding plaintiff's ability to handle the stress of a work week as having largely been based upon plaintiff's "...presentation and uncorroborated subjective symptoms." (Id.).  On that point, the Court is more likely to defer to the opinions of a mental healthcare professional whose training and experience is to winnow out the credible reports offered from patients from those that are worthy of less credence.  The ALJ also discounted Dr. Fowler's opinion as embracing an ultimate issue to be resolved by the Commissioner. (Id.). While the ultimate decision as to whether or not a claimant is disabled is entrusted to the Commissioner, medical source opinions on an individual's residual functional capacity are to be considered.  20 C.F.R. §416.927(e)(1) and (2).

In concluding that plaintiff suffered from no severe mental impairments, the ALJ considered the four broad areas in which the degree of a claimant's functional limitations are to be rated under

20 C.F.R. §416.920a(c)(3), finding that plaintiff had only mild limitations in the activities of daily living, in social functioning, and in concentration/persistence/pace and had experienced no episodes of decompensation. (Tr. p. 18). This was at odds with the opinions of Dr. George, who was also presumably of a conservative nature, who found that in light of Dr. Fowler's earlier findings, plaintiff had moderate limitations in maintaining social functioning and in concentration/persistence/pace. (Tr. p. 315). As the opinions of the Administration's psychological MC were not mentioned in the ALJ's decision, the Court questions the correctness of the finding under §416.920a(d)(1) that plaintiff's mental impairments were not severe.

Admittedly, plaintiff's application for SSI benefits was not summarily denied at the second step of the §416.920 sequential evaluation process based on a finding that none of her impairments were severe. However, given the findings of Drs. Fowler and George, the ALJ should have included some limitations resulting from plaintiff's mental impairments in the hypothetical question that he posed to the VE at the administrative hearing. When tendered to plaintiff counsel for questioning, the VE was asked what effect on the available job pool there would be in light of Dr. George's findings that plaintiff had moderate limitations in nine of the twenty categories of mental activities. (Tr. p. 52).

While the VE discounted the effect of those activities involving detailed instructions because the jobs that she had identified were unskilled, seven of the nine categories of mental activities did not deal with detailed instructions. (Tr. p. 53).

The second area of concern to the Court is the physical RFC assessment that was arrived at by the ALJ and his consideration of the opinions of plaintiff's treating physicians as well as her subjective complaints. In the Function Report that she completed on March 31, 2009, plaintiff indicated that her mobility was impaired to the point to where she had to use a motorized cart to shop. She repeated that requirement to Dr. Fowler when she underwent a consultative psychological evaluation on May 26, 2009. On August 26, 2009, Dr. Marcello completed an admittedly brief checklist form in which he indicated that plaintiff could not stand or walk for two hours in an eight-hour day and could not alternate sitting and standing for eight hours without having a need to walk about or recline. Plaintiff would subsequently testify at the administrative hearing that tasks such as washing the dishes or cooking simple meals had to be done from a sitting position. When Dr. Michalik had reviewed plaintiff's file on June 10, 2009, he found that plaintiff's "...allegations of physical impairments are consistent with the objective findings in the medical evidence provided for review." (Tr. p. 324).

31

In his written decision of July 9, 2010, the ALJ found that plaintiff had the RFC to perform a full range of sedentary work. In doing so, he declined to give controlling weight to Dr. Marcello's opinions of August 25, 2009 as being inconsistent with the findings in the doctor's contemporaneous clinic notes and the fact that he is a general practitioner rather than a specialist. The ALJ also cited the circumstances surrounding the cessation of plaintiff's most recent employment. However, unlike the customary Social Security case in which a claimant is sent to a physical consultative evaluation that typically produced conservative results against which the findings of treating physicians can be weighed, no consultative evaluation was ordered in this case. While the Court is cognizant that a treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown, Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999), particularly when those opinions are submitted in a format like Dr. Marcello's, Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980), the absence of counterveiling evidence from an examining physician, at a minimum, raises the spectre that ALJ should have re-contacted Dr. Marcello for clarification or additional evidence under 20 C.F.R. §416.912(e). Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). And in light of plaintiff's essentially unassailed testimony that she requires a motorized cart to shop and that basic

chores such as washing dishes must be performed from a sitting position, the lack of such evidence casts some degree of doubt on the ALJ's finding that plaintiff could perform a full range of sedentary work.  See Williams v. Astrue, 355 Fed. Appx. 828, 831-32 (5th Cir 2009).

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further development of the record consistent with the Court's opinion.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 15th day of February, 2013.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

33